FILED

2016 Aug-02  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **GWENDOLYN A. SMITH**, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No.: 2:15-CV-326-VEH** |
| | ) |
| **ALABAMA POWER COMPANY,** | ) |
| | ) |
| **Defendant**. | ) |

---

## <u>MEMORANDUM OPINION</u>

This is a civil action filed on February 23, 2015, by the Plaintiff, Gwendolyn A. Smith, against the Defendant, Alabama Power Company ("APCo"). The Complaint alleges employment discrimination, on the basis of race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and 42 U.S.C. § 1981 ("section 1981") (Count One). The Complaint also alleges age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("the ADEA") (Count Two). All Counts arise out of the Plaintiff's employment with the Defendant.

The case comes before the Court on the Defendant's Motion for Summary Judgment. (Doc. 39). For the reasons stated herein, the Motion will be **GRANTED**.

## I.     STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.") (internal quotation marks and citation omitted). The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant. *Chapman*, 229 F.3d at 1023. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249.

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative *evidence* demonstrating the existence of a triable issue of fact." *Id.* (citation omitted) (emphasis added).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16.

3

First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17. When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996). The second method a movant in this position may use to discharge its burden is to provide affirmative *evidence* demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering *evidence* sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

## II.   FACTS

### A.   Alabama Power

APCo is an electric utility operating in Alabama and provides services to 1.4 million customers. APCo is a wholly-owned subsidiary of Southern Company ("SoCo"), an electric utility holding company. APCo's Environmental Affairs ("EA") department has approximately 110 full-time employees who work in either the

Compliance department or Laboratory and Field Services department ("the Lab"). The Lab is further divided into three sections—Chemistry, Fuels, and Quality Assurance/Quality Control ("QA/QC"). Each of those sections has its own supervisor.

The Lab provides analytical data to various internal and external customers to ensure that quality data and field services are provided to demonstrate compliance with state and federal environmental requirements. Among other things, the Lab provides operational support for SoCo's power plants as well as transmission and distribution business units.

### B.    <u>Markell Heilbron</u>

From approximately 1998 to 2003, Markell Heilbron (American-Indian, age 40) served in various roles in Human Resources. She received extensive training on selection processes, including interviewing and hiring decisions, performance management, and APCo's Equal Employment Opportunity policy. Heilbron has been an EA General Manager since May 28, 2011, and has responsibility for the Lab. Heilbron manages approximately 76 regular employees and 15-20 leased employees. The Lab section supervisors in Chemistry, Fuels, and QA/QC report to Heilbron.

### C.    <u>Gwendolyn Smith</u>

The Plaintiff, Gwendolyn Smith (African-American, age 55), is currently employed as a Staff Environmental Affairs Specialist in the Chemistry section of the

Lab. She has worked in the Chemistry section since February 2013. Prior to that, she worked in the Fuels section.

From 2007-2012, Smith held the title of Lead Chemist for Fuels. When Heilbron became the EA Manager, there were two other Lead Chemists in Fuels—Garry Michael ("Mike") Worthy (White, age 58) and Durant Maske (White, age 48 in May 2014[1]). In these roles, Smith, Worthy, and Maske had some team lead responsibilities, including scheduling work to be done in the lab, drafting performance plans, making recommendations for SPOT awards[2], and drafting goals. The Lead Chemists had no authority to hire, terminate, promote, give pay increases, or discipline other employees.

No employees reported directly to the Lead Chemists. Instead, all employees in the Fuels group, including Smith, reported to Donna Wilson[3], the Fuels supervisor. Although the Lead Chemists drafted the goals for the year and the performance evaluations, Wilson decided the ultimate rating given to the employee. Also, Wilson attended the goal setting and performance evaluation discussions led by the Lead Chemists.

---

[1] One of the positions which is at issue in this case was filled in May of 2014.

[2] Smith testified in her deposition that these were monetary awards given to employees for good performance. (Doc. 41-1 at 27(101-102)).

[3] The parties have not stated Wilson's race or age.

### D.    **The June 3, 2011, "Concern"**

On June 3, 2011, a Lab employee filed an anonymous "concern" through APCo's Corporate Concerns Program. The Corporate Concerns Program provides employees with an alternative process to communicate work-related issues in confidence to the Ethics & Corporate Concerns Department. Employee concerns are investigated by a representative of the Concerns Program.

Heilbron reviewed the investigation report summarizing findings related to the concern and determined that it involved a Lab employee in the Fuels group having several altercations with other employees. Heilbron understood that the allegations had been brought to the attention of Wilson, but that she had not addressed the issues.

Smith was interviewed regarding the concern that was filed. (Doc. 41-1 at 54(209)). Smith discussed the interview in the following exchange from her deposition:

> Q.    Were you interviewed . . . about a concern filed in the Fuel section?
>
> A.    I was.
>
> Q.    Okay. During that investigation, do you recall discussing . . . some issues about whether or not you had reported some employee problems?
>
> A.    Right. Yes.
>
> Q.    Is that correct? And were you counseled in any way about

reporting employee problems in the future?

A.      Yes.

Q.      As I understand it, you were counseled because management reached the conclusion that you did not report to upper management some employee problems you were aware of?

A.      I have reported two incidents prior, and Mike [Worthy] and I took -- it was a person that was reporting to me, the two people that was reporting to Mike, so we got them all together. This is before, right before Markell [Heilbron] came. They said it was squashed, it was over; but it turned -- we didn't really have a supervisor at the time. They said it was over, we assumed it was over, but it wasn't.

Q.      Was this some type of harassment issue or something?

A.      Harassment? I -- I wouldn't say harassment. But it was three guys that were not getting along.

Q.      Was there some incident or were there some incidents that were not reported that should have been reported?

A.      That incident when they almost had a big fistfight was not reported.

Q.      You didn't report it?

A.      When I tried to report it to my supervisor, she said she was tired of the ya-yaing; I don't want to hear it; if anybody else comes to me with a complaint, they will be reprimanded along with the person that reported it.

Q.      Who was the supervisor who said this?

A.      Donna Wilson.

8

Q.    And did you explain that to Steve Johnson when he was investigating this?

A.    Yes, I did.

Q.    Were there any other incidents that you did not report?

A.    Not that I recall, no.

Q.    Were you reporting that incident about when they nearly came to blows with –

A.    No, I was -- after they said it was over, one of the guys that reported to me called me, said when he was leaving work, Matt Phillips, I think, made a threatening gesture to him, so when I -- we had a team meeting the next day to discuss all of this, and she just said I don't want to hear about it. Whoever -- if this continues, whoever's doing it will be reprimanded, whoever comes and tells me about it will be reprimanded. I raised my hand in the meeting, she said I don't want to hear it.

Q.    Donna Wilson said this to the group?

A.    To the group.

Q.    Had -- what had you failed to report?

A.    The incident when they almost came – they got into a verbal altercation in one of the labs.

Q.    They almost came to blows?

A.    Well, I didn't witness it, just I know it was a heated argument between three guys.

Q.    And -- okay. For that incident, why didn't you report it up and escalate it?

9

A.     Well, at the time, no one was there. Donna was not there. We didn't have a [L]ab manager. Markell had been named, as a matter of fact, the incident -- the day she came to tour the [L]ab was the day that it happened, when this big -- as a matter of fact, I think it was during her tour that these three got into it.

Q.     You didn't report it to HR either, though?

A.     No, I didn't.

(Doc. 41-1 at 54(209-212)).

Based on Heilbron's review of the investigation of the concern, and in consultation with Human Resources and outside legal counsel, Heilbron concluded that Smith, as well as Worthy and Maske, failed to demonstrate a duty to act in accordance with APCo's Code of Ethics when they did not report the employee issues to management. As a result of the investigation, Wilson left the company.  The three Lead Chemists—Smith, Maske, and Worthy—had their team lead oversight responsibilities removed and were reclassified as Staff Environmental Affairs Specialists as of November 1, 2012 (with no loss of pay or grade level).

Heilbron, after discussions with management and Human Resources, decided that it was necessary to bring in someone from outside the Lab to replace Wilson due to the dysfunction identified during the investigation of the concern. Ultimately, Heilbron selected Tracie Hill (White, age 47) to fill the Fuels supervisor position on August 1, 2011. After Hill was placed in the Fuels supervisor position, Smith, Maske,

and Worthy began reporting to her.[4]

### E.   **Smith's 2013 Performance Review**

APCo employees periodically are evaluated using a document entitled "Performance Plan & Summary." This document classifies employee performance in one of three categories: Expectations Clearly Exceeded, Expectations Fully Met, Expectations Not Fully Met.[5]

At midyear in 2013 Smith was rated "3 – Fully Meets" by Charles Horn. Horn wrote:

> Gwen was moved to support the Chemistry Section in complying with new Quality Management Goals. She accepted her new role and supported the section in many capacities in our efforts towards accomplishing QMS goals and testing demands of our clients. Her commitment to teamwork not in the Chemistry Section but Fuels is well [sic] and is an example of Southern Style.

---

[4]  Though this position is mentioned in Smith's complaint, she testified that she is not pursuing claims of race or age discrimination based on Hill's selection for the position.  In her brief, the Plaintiff admits that there is no claim based upon this position (doc. 44 at 3, ¶3) and she makes no argument regarding it.

[5]  The Plaintiff proffers the following fact:

Alabama Performance Plan & Summary classifies employees performance in one of three categories: Expectations Clearly Exceeded, Expectations Fully Met, Expectations Not Fully Met. Doc. 41-2 pg. 061.

(Doc. 44 at 8, ¶6).  The Plaintiff's citation is incorrect, sending the Court to a random page from the index to Heilbron's deposition. Further, the Court assumes that the Plaintiff meant to write "Alabama Power's Employee Performance Plan & Summary" here.  The Defendant admits "that those were the options for the 2012 calendar year."  (Doc. 46 at 2, ¶6).  Accordingly, the court adopted this fact as it did.

(Doc. 41-1 at 160).[6] Horn also stated that "Gwen understands and complies with corporate, departmental[,] and laboratory policies. She provides analytical support to assure samples are completed within required time limits." (Doc. 41-1 at 163).

She received a "3-Fully Meets" from William Garrett on her 2013 "Year-end Summary." (Doc. 41-1 at 160). Garrett wrote:

> Gwen is committed to working safely, and she achieved Target Zero in 2013. Gwen has led the efforts in improving our Laboratory Hazard Assessment Program. Gwen provided analytical results for 6 primary methods, some of which are moderately complex. She helped to recruit and cross train some of our COOP's and leased employees. She also supported the team by providing peer reviews for additional methods outside her primary responsibility (i.e coal quality). She helped write some TSOPs with Dade Moeller Consultants. She demonstrated teamwork and is to be commended for working well with the Quality Assurance group and the chemical inventory/hazardous waste team to address inactive chemicals. Moreover, she is a key member of the Lab Chemistry Group and exhibits Southern Style.

(Doc. 41-1 at 160). "Southern Style" is a term of art used by the company when reviewing employees. It means:

> Model ethical, professional behavior and promote respectful teamwork within and across the groups.
>
> – Unquestionable Trust – Honesty, respect, fairness[,] and integrity drive our behavior. Always do the right thing.

---

[6] This fact, as proffered by the Plaintiff, omitted several words from the quote, and cuts off mid sentence at "Her commitment to teamwork not in the Chemistry Section but Fuels is well . . .." (Doc. 44 at 8, ¶8). Her fact, as proffered, also lacked a citation to the record. (Doc. 44 at 8, ¶8). Because this fact was admitted by the Defendant, the Court included it after scouring the record in order to find the document quoted, and accurately quote and cite it.

Unquestionable Trust does not equal unquestioning Trust.

–   Superior Performance – Safety first, teamwork, diversity[,] and continuous improvement. Strive for perfection and avoid complacency.

–   Total Commitment – Be focused, fully engaged, and accountable. Have ownership in all that you do. Be committed to our team, our department, and our company.

(Doc. 41-6 at 49).

### F.   Observations of Smith's Supervisors

Heilbron and other supervisors, including Tracie Hill, Bill Garrett, and Marlene Bumpers, have noted that Smith has problems with her non-verbal communication skills, particularly when given constructive feedback. (Doc. 41-6 at 7, ¶16). For example, when given constructive feedback or if someone has a differing opinion, management has observed Smith cross her arms, roll her eyes[7], sigh, or become defensive. (Doc. 41-6 at 7, ¶16). Other times, management has observed her shut down and appear not to listen to the feedback given. (Doc. 41-6 at 7, ¶16). Smith has been coached on these behaviors by several supervisors and in her performance evaluations. However, management has not observed her making an effort to accept the feedback and improve. (Doc. 41-6 at 7, ¶16).[8]

_____

[7]  Smith denies that she ever rolled her eyes at any fellow employee or supervisor.

[8]  The Plaintiff disputes the facts in this paragraph with only the following: "Dispute. Smith has been observed to have excellent leadership skills."  (Doc. 44 at 3, ¶14).  This vague

Smith also has failed to report issues to her supervisor, such as communicating to management on critical customer needs for analytical data, which on one occasion resulted in the late submission of wear metals data without advanced notification to the customer. (Doc. 41-6 at 8, ¶17). Smith has also demonstrated issues with time management. (Doc. 41-6 at 8, ¶17).

Additionally, in both 2013 and 2015, when supervisors were asked to rank their employees based on performance, skills, behaviors, and value to the EA department, Smith was identified as an employee in the bottom 15% of the EA group by two different supervisors, Charles Horn (White, age 62) and Marvin Burrell (African American, age 39). (Doc. 41-6 at 8, ¶18).[9]

─────────────────

"dispute" addresses no specific portion of these facts as proffered by the Defendant, and no portion of the record in support of her dispute is cited. This Court's Uniform Initial Order, entered in this case on May 13, 2015, provides that "[a]ny statements of fact that are disputed by the non-moving party must be followed by a specific reference to those portions of the evidentiary record upon which the dispute is based." (Doc. 16 at 17). The facts in this paragraph, as proffered by the Defendant, are supported by the record and have been adopted by the Court.

[9] The Plaintiff disputes this fact, saying only "hearsay and plaintiff has been given no ranking of employees." (Doc. 44 at 3, ¶16). To the extent that the Plaintiff feels that the evidence cited in support of this fact is not properly considered, she should have filed a Motion to Strike or an objection pursuant to Rule 56(c)(2) of the Federal Rule of Civil Procedure ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Regardless, to the extent that this sentence fragment can be considered an objection based on hearsay, it is **OVERRULED** because the Court does not know for what purpose this evidence will be offered. The remainder of this "objection" is too vague for the Court to sustain. Accordingly, it too is **OVERRULED**.

### G.      Smith Moves to the Chemistry Section

Both Smith and Worthy were moved to the Chemistry section in February 2013 due to shifting workload from the Fuels section to the Chemistry section. Both were given a 3% increase in base salary for agreeing to move. At that time, Smith began reporting to Charles Horn, then the Chemistry supervisor. Horn later retired from APCo, and Bill Garrett (White, age 57) was appointed as interim Chemistry supervisor until the position could be posted and filled.

### H.      Filling the Chemistry Supervisor Position in March 2014

#### 1.      *Job Posting and Initial Candidate Screening*

Heilbron worked with Human Resources recruiter Emily Anne Dean (White, age 28) to draft a job description generally outlining the job duties and qualities sought in applicants. The job description generally summarized the position and included the following attributes that Heilbron was looking for: (1) minimum 24 semester hours of chemistry; (2) lab experience; (3) knowledge of chemical analyses; (4) technical knowledge or ASTM, SM, and EPA analytical methodology; (5) experience using ISO 17025 and NELAC Institute (TNI) Standards; (6) demonstrated leadership skills; (7) excellent interpersonal, communication, and leadership skills; (8) proven planning and scheduling skills; and (9) budgeting experience. Specifically, Heilbron was looking for someone who was customer-focused with demonstrated

leadership and performance management experience to motivate the team, set goals, manage performance, develop employees, and manage workload. (Doc. 41-6 at 9, ¶21).[10] Dean posted the position to JobSource from November 6 to November 20, 2013. The position was posted both internally and externally, and 51 applications (including the Plaintiff's) were received.

As the recruiter, Dean was responsible for reviewing each application and resume submitted. Because Dean knew the key requirements for the position, she was able to screen candidates and send Heilbron the top candidates for the position. For this posting, Dean sent Heilbron 17 candidates. Smith's resume and application were among those sent to Heilbron for further review.

### 2.    *Matrix Screening*

Heilbron, along with HR Business Consultant Melissa Hyche (White, age 40), put together a screening matrix of criteria Heilbron was looking for in a successful applicant. Heilbron and Hyche also put together a list of "Criteria Definitions," which were numerical scores to use in evaluating the candidates. (Doc. 41-7 at 8). The criteria included on the screening matrix were (i) Chemistry, Biology, or

---

[10]   The facts in this paragraph were proffered by the Defendant.  The Plaintiff disputes these facts and includes a citation to "Worthy pg. 53."  (Doc. 44 at 3, ¶19).  The Court assumes that the Plaintiff is referring to the deposition of Garry Worthy, at page 53.  Nothing on that page of Worthy's deposition disputes the facts in this paragraph.

Environmental Science Degree, including 24 semester hours of Chemistry; (ii) Lab Experience; (iii) ASTM, SM, EPA Methods; (iv) ISO/TNI Experience; (v) Leadership/Performance Management; (vi) Budgeting; and (vii) Written Communication. Each of these criteria was defined with subcategories (the "criteria definitions") assigning a numerical value corresponding to the appropriate level of experience had by a candidate. For example, a person with "[b]asic knowledge of budgeting" would be assigned a value of 1 for "Budgeting," while a person with "[b]udget responsibilities" would be assigned a 2. (Doc. 41-7 at 8).

After assembling the selection matrix, Heilbron and Hyche together reviewed the resumes and applications of the candidates given to them by Dean. Upon reviewing the candidates' resumes, applications, and job experience (if known to Heilbron), Heilbron and Hyche applied the criteria definitions to assign a numerical score for each criterion. After totaling the numerical values for each criterion as to each candidate, Heilbron and Hyche selected for interviews those who scored the highest.

Typically, Heilbron prefers to interview five to six people (the number that can be completed in one day). However, if she had narrowed this screening to five or six candidates, it would have omitted several Lab employees, including Smith. Heilbron wanted the internal Lab candidates to have an opportunity to compete for the position

and broadened the number of candidates selected to interview to 7, the cutoff score being 14.

Smith scored a 14 on the screening matrix. She was given a 3 for the Lab Experience and ASTM, SM, EPA Methods categories—the highest possible score for these two categories.[11] She received a 2 (out of 4) in ISO/TNI Experience because she met the definition of "Proficient Experience (2-4 years)" based on the fact that Smith and other chemists in the Lab had been working towards ISO accreditation for about two years. Smith received a 2 (out of 5) in Leadership/Performance Management because she had some team leader responsibilities from 2007 until midway through 2011. Smith also was given a 2 (out of 3) for Budgeting because Smith indicated on her resume that she had "[o]ver five years' experience in planning and implementing an annual budget of $800,000." (Doc. 41-7 at 5).[12] Finally, she was given a 2 (out of 3) for Written Communication because, based on her review of Smith's resume, Heilbron determined that her resume was of average quality and did not stand out in comparison to some of the top candidates' resumes. This gave Smith a total score of

---

[11]  *See* the criteria definitions–doc. 41-7 at 8.

[12]  This budgeting experience was as part of a committee in her church, not in her job. (Doc. 41-1 at 31(118)-33(125)).  The Plaintiff has never been involved in managing a budget for Alabama Power.  (Doc. 41-1 at 32(124)).  It is unclear whether, for this first posting in which the Plaintiff was scored a 2, Heilbron knew that the Plaintiff's budgeting experience was not work related.

14.

In contrast, Marlene Bumpers, the successful applicant, scored a 17, primarily because she received a 4 (out of 5) for Leadership/Performance Management as she spent four years as a lab manager and three years as a production supervisor for another company (BASF Corporation), managing between 12-14 employees. She also received a 3 on Budgeting because she managed a monthly budget of 7.75 to 9 million dollars at BASF as well as budgets in her role as Sr. Environmental Compliance Specialist at APCo's Gadsden Steam Plant. She received a 3 for ISO/TNI Experience because she managed an ISO-certified lab at BASF Corporation.  Cindy Dillard's overall score was 16 based on similar application of the criteria.

### 3.    *Interviews*

To interview the seven candidates, Heilbron assembled a selection committee which, in addition to herself, was comprised of: Kim Washington (African American, age 40), Anne Ryals (White, age 58), Hill, Garrett, Mike Godfrey (White, age 60), and Hyche.

Heilbron drafted a list of questions and Hyche reviewed the questions. The same questions were asked of each candidate. Each candidate also was responsible for giving a presentation on lab accreditation. After each candidate interviewed, the committee discussed the candidate, with Hyche taking down notes representing the

panel's discussion on the candidate's strengths and developmental needs. Following the conclusion of all interviews, the committee again discussed the candidates and narrowed it down to the final two—Bumpers and Dillard.

While Smith performed adequately in her interview, the selection committee noted, among other things, that she had "[l]imited performance management" and "seemed to need to go deeper on more of the questions." (Doc. 41-6 at 13, ¶32; doc.41-7 at 26).  Heilbron and the selection committee perceived that most of Smith's answers did not provide sufficient depth necessary to fully answer questions during the interview. (Doc. 41-6 at 14, ¶32). The selection committee also discussed Smith's lack of communication skills in keeping management informed on issues, her inability to accept constructive feedback, and past issues with meeting deadlines. (Doc. 41-6 at 14, ¶32).

In contrast to Smith, Bumpers performed well in her interview, demonstrating a high degree of initiative, as well as good planning and organizational skills. Bumpers also had many years of leadership experience and demonstrated performance management as a lab manager with 12-14 direct reports[13]—experience

---

[13]  The parties do not define "direct reports."  However, from the context in which the parties use it, "direct reports" seems to refer to employees who directly report to a person.

Smith did not have. In addition, Bumpers had recent plant experience.[14]

Dillard was selected as one of the final two because, unlike Smith, she had over two years experience in supervisory roles in a lab with performance management responsibilities. Additionally, she had impressive research experience and a strong focus on data integrity—neither of which Smith mentioned in her interview. Dillard also had extensive experience developing and implementing standard operating procedures for EPA-approved methods.[15]

Bumpers and Dillard again interviewed with some of the selection committee members. Heilbron followed up with both Bumpers's and Dillard's managers to gain feedback on their leadership and performance. Ultimately, Heilbron decided to select Bumpers to fill the position primarily because of her extensive lab management experience, recent plant experience, and planning and budgeting experience. This decision was made based upon a review of Bumpers's resume, application, interviews, and a discussion among the panel. **It is undisputed that, even without considering Smith's performance issues, she would not have been selected for the position over Bumpers because Bumpers had superior qualifications.** (*See*, doc.

[14] The Plaintiff "[n]either [a]dmit[s] nor [d]en[ies]" the statements in this paragraph. (Doc. 44 at 5).

[15] The Plaintiff responds to the facts in this paragraph with neither "disputed" nor "admitted," writing instead only: "Dillard was not selected when Bumpers resigned." (Doc. 44 at 5).

40 at 16, ¶34 (Defendant's proffered fact); doc. 44 at 5, ¶34 (Plaintiff's admission)).
Smith began reporting to Bumpers on March 10, 2014.

Following the interview process and announcement of the successful candidate, Heilbron met with Smith to give her feedback on what the committee identified as her strengths and developmental needs, including her limited performance management experience, the need to provide more depth when answering interview questions, the need to provide more examples of ways to develop employees, and the fact that critical processes were missing from the presentation she gave. (Doc. 41-6 at 15, ¶37). She also communicated that there were other candidates who had more to offer and more lab management experience and that is what differentiated them from Smith. (Doc. 41-6 at 15, ¶37).[16]

## I.  Filling the Chemistry Supervisor and Fuels Supervisor Positions in May 2014

### 1.  *Job Posting and Initial Candidate Screening*

Not long after Bumpers started in her position as Chemistry supervisor, she learned that she would be leaving the Birmingham area when her husband was transferred. Around this same time, Hill, who was the Fuels supervisor, was given a

---

[16] The Plaintiff disputes the facts in this paragraph with merely: "Dispute. Smith was as qualified for the position." (Doc. 44 at 5). This response fails to include a citation to relevant evidence which disputes the evidence offered by the Defendant. Further, it is vague and underdeveloped. The facts offered by the Defendant in this paragraph are deemed admitted for the purpose of deciding the instant motion.

developmental opportunity to become Compliance & Support Manager.[17] This created the need to fill the two supervisor positions being vacated by Bumpers and Hill.

Heilbron elected to post the two EA Supervisor positions in one job posting. She again met with Dean to draft a job description that incorporated both positions' job qualifications. The posting stated that the positions would be open for applications on April 24, 2014, and closed for applications on May 5, 2014. (Doc. 41-2 at 92). The position was <u>actually</u> posted from April 24, 2014-May 7, 2014. (Doc. 41-6 at 16, ¶40; doc. 41-8 at 4-5, ¶6). Sixty-two applications were received, including Burrell's application, which was submitted on May 7, 2014. (Doc. 41-2 at 99).[18] After review, 13 individuals were considered as potential candidates, including Smith, Maske, and Worthy from the Lab. (Doc. 41-6 at 16, ¶40).

———————————

[17] To be promoted at Alabama Power, an individual can apply for promotions when they see a job opportunity or they can be selected for "developmental opportunities." A developmental opportunity is where jobs are not posted and the developmental candidates are given jobs to allow the employees to obtain more knowledge and experience. Although Alabama Power is aware that Smith is interested in promotion, the company has never considered her for a developmental opportunity. (Doc. 41-2 at 16(57)). At least two of Smith's white supervisors, Heilbron and Hill, received promotions outside of the posting process through "developmental opportunities" that advanced their career. When asked during her deposition if Smith had been considered for Compliance & Support Manager, Heilbron stated: "Not that I know of." (Doc. 41-2 at 16(57)).

[18] Emily Dean, Talent Acquisition Manager for Alabama Power, states in her affidavit that the position was posted until May 7, 2014. (Doc. 41-8 at 4, ¶6). She states that Burrell could not have submitted an application after the deadline because the posting, which was online and required online applications, would no longer have been available. (Doc. 41-8 at 5, ¶7).

## 2.    *Matrix Screening*

Heilbron and Hyche made another screening matrix for this posting, which was similar to the screening matrix for the previously posted Chemistry supervisor position, with a few modifications. (Doc. 41-7 at 28). Power Generation experience was added as a desired quality because Heilbron, after hiring Bumpers, realized that having Power Generation plant experience was very valuable in helping Lab employees gain a better understanding of the customer's needs at the power plants. Additionally, the definition for Leadership/Performance Management changed in that, for the combined posting, Heilbron did not differentiate between team leader and supervisor experience as she had done for the first EA Supervisor-Chemistry posting.[19]

Smith received the same overall score (14) on the screening matrix as she did for the first Chemistry supervisor posting. Her Lab Experience, ASTM, SM, EPA

---

[19] The facts in this paragraph were proffered by the Defendant.  In response, the Plaintiff writes:

> Dispute the portion concerning the definitions of leadership. Heilborn [sic] made some type of distinction because although only a few months after the December posting Maske received a higher leadership score than Smith. Doc 41-7 pg. 7 v. 27.

(Doc. 44 at 5-6, ¶39).  This is argument, and it does not directly dispute the facts as stated by the Defendant.  The Defendant's proffered facts in this paragraph are deemed to be admitted as stated.

Methods, and ISO/TNI scores, the criteria for which had not changed, remained the same. Smith's score remained the same for the Leadership/Performance Management category, even though the criteria changed, because she had 2-4 years of supervisory experience. She received a 2 in Power Generation because she had less than two years of plant experience from early in her career. Smith received a 1 for Budgeting based on Heilbron's determination that, although Smith's resume stated she managed a budget of $800,000.00, she had performed no budgeting duties in her current position. (Doc. 41-6 at 17, ¶42; doc. 41-7 at 28, 29).[20] Because Heilbron believed that Smith had overstated her budgeting experience, she rated her a 1 on Written Communication.[21]

---

[20]   Even if Smith had made clear that she had budgeting experience through her church, Heilbron still would have rated her a 1 because she was part of a church committee and did not have direct responsibility for the budget. Additionally, this experience would not have been relevant to managing a budget in the Lab. (Doc. 41-6 at 18, ¶42).

[21]   The Plaintiff responds to the facts in this paragraph with the statement: "Admit in part, deny in part.  In the interview[,] Heilborn [sic] noted that Smith managed the 800k church budget was relevant for the job.  Doc. 41-1 pg. 187." (Doc. 44 at 6).  This vague response does not explain what portion of this paragraph is disputed.  The document referenced (doc. 41-1 at 187) appears to be the typewritten questions asked of Smith by the committee, along with handwritten noted from Heilbron.  The first question states:

> Please describe aspects of your background, leadership[,] and experience that make you a good candidate for this position.  Include any specialized laboratory skills, knowledge[,] or expertise that is relevant to this job.

(Doc. 41-1 at 187).  In the space left for notes after this question, Heilbron has written, among other things, "$800k budget resp for church."  (Doc. 41-1 at 187).   Whatever inference can be gleaned from this note, it does not dispute whether Heilbron thought that the Plaintiff had overstated her budgeting experience.

25

In contrast, Burrell and Maske, the successful candidates for these EA Supervisor positions, received overall scores of 18 and 16 respectively. Heilbron rated Burrell a 3 in Lab Experience because he had worked in a lab since 2002. He also received a 3 in ASTM, SM, EPA Methods because he had experience working with methods when performing lab tests at Plant Gorgas as a Chemical Technician. Additionally, he also used methods to draft procedures for Kemper County's lab that was being developed. Heilbron rated him a 0 in ISO/TNI. Burrell received a 4 in Leadership/Performance Management because he had current supervisory experience within the last two years through his role as Lab Team Leader with SoCo's Kemper County IGCC Facility. He also received a 4 for Power Generation because he had worked at a plant since 2002.[22] Burrell received a 2 on Budgeting because he indicated on his resume that he was the "system owner" at Plant Gorgas with budgeting responsibilities for operations, maintenance, and capital related to the plant's water treatment facility and some environmental control equipment. Finally, Burrell received a 2 for Written Communication based on Heilbron's review of his

---

[22] On the matrix printout which shows the scores for all candidates, the stated scale for that category is "1-3." (Doc. 41-7 at 27). However, as noted previously, scores were actually assessed using the criteria definitions, which required that Burrell be scored on a scale of 0-4 for this category. (Doc. 41-7 at 28). The ranges noted on the matrix clearly mean nothing since Burrell received a "0" for "ISO/INI Exp." when, on the matrix, the range for that category is listed as "1-4."

resume for content and grammar.[23]

Maske, like Smith, had worked in the Lab for over 20 years and had a Chemistry degree. Maske received the same scores as Smith in the Lab Experience, ASTM, SM, EPA Methods, ISO/TNI, and Budgeting categories. However, Maske received a 3 in Leadership because he had been a team leader for approximately seven years. Maske received a 1 in Power Generation because he did not have recent plant experience. Last, Maske received a 3 in Written Communication because Heilbron found no errors on his resume and application and believed it was professionally formatted.[24]

---

[23] The Plaintiff does not dispute that these scores were actually given. She disputes "that the matrix was properly scored." (Doc. 44 at 6). She states: "Maske served in team lead for barely over a year, since 11/10/2012. Doc. 41-7 pg. 53. Burrell was previously assigned the Kemper lab, a start-up lab that was not fully operational. Worthy Dep. pg. 53, lines 15-22. Doc 41-3 pg. 15." (Doc. 44 at 6). She provides no further explanation for her dispute.

[24] The Plaintiff proffers the following fact which the Court reprints here formatted and written <u>exactly</u> as Plaintiff's counsel proffered it:

> 19. Although it was at least one of the jobs (Chemistry supervisor) was identical to the prior posting, Heilborn [sic] (and Hyche) rescored the criteria which resulted in Maske receiving a score of 16, rather than his previous 15. Compare doc 41-7 pg. 7 v. doc 41-7 pg. 27.
> 7, pg. 27.

(Doc. 44 at 10, ¶19). This proffered fact does not accurately reflect why Maske's scores were different. Maske's overall score changed from the time he was evaluated for the previous posting because he went from a 2 to 3 in Leadership/Performance Management, was given a 1 for Power Generation, and went down from 2 to 1 in Budgeting. (Doc. Doc. 41-7 at 7, 27). Maske received a 3 leadership because he had been a team leader for approximately seven years. (Doc. 41-6 at 19, ¶44). Heilbron gave Maske, and all of the candidates, credit for supervisory experience prior to 2011.

### 3. *Interviews*

Six candidates were invited to interview for the positions—Cynthia Dixon, Maske, Shane McCray, Laura Berry, Marvin Burrell, and William Smith. All scored a 16 or above, which Heilbron and Hyche determined to be the natural break on the screening matrix. Because Smith's score fell below this threshold, she was not invited to interview.

The selection committee for this posting consisted of Heilbron, Chad McKnight (White, age 39), Ryals, Circe Starks (African American, age 37), Garrett, and Godfrey, with Hyche serving as facilitator. Heilbron drafted interview questions which Hyche reviewed. The same questions were used for each candidate.

After each candidate was interviewed, the committee discussed developmental needs and strengths. Many of the committee members took their own notes during this discussion, and Hyche later typed out the group's collective thoughts. Interviews were conducted on May 15, 2014.[25] After the committee discussed the candidates, Heilbron ultimately announced, on May 22, 2014, via email, that Burrell and Maske were selected as the Chemistry supervisor and Fuels supervisor, respectively.

---

[25] In her notes regarding Maske's interview for the supervisor position, under a column labeled "Dev. Needs," Heilbron wrote: "presentation-maintain more eye contact w/ the audience." (Doc. 41-2 at 86). In his notes regarding the same interview, Garrett noted that Maske "[n]eeds" "Eye contact." (Doc. 41-2 at 83).

Burrell was selected for the Chemistry supervisor position primarily because he was currently in a management position at Kemper County as a team leader with approximately nine direct reports and was responsible for all aspects of hiring, performance management, managing large budgets, and starting up the lab. Additionally, Burrell had cross company operating experience, which was valuable because he had performed a variety of job functions and brought customer insight related to fossil and hydro generation.

Maske was selected for the Fuels supervisor position in large part because he demonstrated leadership qualities and was also vocal in his interview about what he was doing to help lead the team, including scheduling, writing methods, and managing the methods that needed updating for the Fuels section. Additionally, Maske provided good leadership examples in his interview, highlighting his role as co-chair of the ASTM committee for limestone testing (which Smith did not have) and his broad experience performing all aspects of fuels, limestone, and gypsum testing, distinguishing him from other candidates. Smith believed that, of those who interviewed for the Fuels supervisor job, Maske was the most qualified.

### J.      Maske's Level 3 Discipline

For the year 2012, Maske was rated "Expectations Not Fully Met" and "not performing up to expectations" in his annual evaluation. In his Year End Summary,

Maske's manager explained:

> Earlier this year, Durant had a lapse in judgment with regard to methods and procedures. He avoided strict adherence to a laboratory procedure and failed to comply with his "duty to act" with knowledge about other employees avoidance of following the policy. For this reason, Durant has not fully met the expectations for 2012.

(Doc. 45-1 at 4-5).[26] Maske also received a Level 3 discipline on March 29, 2012, but the parties have not been clear as to whether it was for this same incident. According to Alabama Power's "Non-Punitive Discipline" policy:

> Third Level Notice is the most serious level of formal discipline. It is used when an employee does not meet a commitment to improve during the period of a Second Level Notice, or when a single infraction is serious enough to warrant this level of discipline.

(Doc. 45-2 at 4).

> In her declaration, Hyche stated that

> APCo has a non-punitive discipline policy, and once a discipline expires, it is removed from the employee's file and is not to be considered in further employment decisions. Maske's discipline expired on September 29, 2013.

(Doc. 41-9 at 6, ¶11). Heilbron stated in her declaration that, because of this policy, she "did not consider the Level 3 discipline Maske received in 2012 when awarding him the [Fuel supervisor] position." (Doc. 41-6 at 21-22, ¶49).

---

[26] Maske reported inaccurate results that were sent to customers.

### K.    Other Facts

In her deposition, other than the fact that Marlene Bumpers and Marvin Burrell were younger than her, Smith could offer no evidence that the decisions to select them were based on age. (Doc. 41-1 at 62(244)-65(245); doc. 41-1 at 71(277)). In her deposition, other than the fact that Marlene Bumpers and Durant Maske were white and that there had been no other African-American supervisor in the Lab until Burrell was hired, Smith could offer no evidence that the decisions to select Bumpers and Maske were based on race. (Doc. 41-1 at 62(241-243)); doc. 41-1 at 67(264)-68(265)).

## III.   ANALYSIS

The Plaintiff alleges that the first time the Defendant discriminated against her was in March of 2014 when it gave Bumpers, and not her, the position of Chemistry supervisor. She also alleges that the Defendant discriminated against her a second time, in May of 2014, when it gave the Chemistry and Fuel supervisor positions to Burrell and Maske, respectively, instead of to her.[27] She alleges that both incidents

---

[27] In her brief in response to the Motion for Summary Judgment, the Plaintiff, in one paragraph, writes:

> Smith's white supervisors (Heilborn and Hill) benefitted from professional development opportunities where they were selected for job opportunities outside of the positing process. Smith, the African-American woman, over a 29 year career had no such opportunities.

were the result of race discrimination in violation of Title VII and section 1981. She also alleges that both incidents were the result of age discrimination in violation of the ADEA. Her claims are based upon circumstantial evidence.

The Eleventh Circuit has noted:

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of his race. 42 U.S.C. § 2000e–2(a)(1). Similarly, 42 U.S.C. § 1981 prohibits race discrimination in employment by providing that all persons shall have the same right to make and enforce contracts as white citizens. 42 U.S.C. § 1981(a). In the employment context, the elements of a race-discrimination claim under § 1981 are the same as those in a Title VII disparate-treatment claim. *Rice–Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n. 11 (11th Cir.2000).

The ADEA, in turn, makes it unlawful for an employer to discharge or otherwise discriminate against an employee because of his age. 29 U.S.C. § 623(a)(1). Specifically, the ADEA prohibits employment discrimination against individuals who are at least 40 years of age. *Id*. § 631(a).

Where, as here, a plaintiff puts forth only circumstantial evidence in support of [her] discrimination claims, we generally apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir.2002); *see Sims v. MVM, Inc.*, 704 F.3d 1327, 1332–33 (11th Cir.2013) (ADEA); *Smith v. Lockheed–Martin*, 644 F.3d 1321, 1325 & n. 14 (11th Cir.2011) (Title VII and § 1981). Under this framework, the plaintiff bears the initial

---

(Doc. 44 at 20). This allegation does not appear in the Plaintiff's Complaint and "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004). Accordingly the Court will not consider this allegation.

burden of establishing a prima facie case of discrimination. *Joe's Stone Crabs, Inc.*, 296 F.3d at 1272. If the plaintiff establishes a prima facie case, he creates a rebuttable presumption that the employer unlawfully discriminated against him. *Id*. The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Id*. If the employer satisfies this burden of production, the burden shifts back to the plaintiff to demonstrate that the proffered reason is merely a pretext for unlawful discrimination. *Id.* at 1272–73. Although the burden of production shifts back and forth, the ultimate burden of persuasion always remains with the plaintiff. *Id*. at 1273.

*Benjamin v. SNF Holding Co.*, 602 F. App'x 758, 761–62 (11th Cir. 2015).

Under the *McDonnell Douglas* framework, to prevail on a claim of failure to promote, a plaintiff may establish a prima facie case of [race] discrimination by showing that: (1) she is a member of a protected class; (2) she was qualified and applied for the promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the protected class were promoted.

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004).

To establish a prima facie case under the ADEA, the plaintiff bears the burden of proving that (1) [s]he was a member of the protected class (i.e., at least 40 years old at the time of the adverse employment action); (2) [s]he was subject to an adverse employment decision; (3) the position [s]he sought was filled by a substantially younger person; and (4) [s]he was qualified for the position. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1043 (11th Cir.2000) (en banc). Age discrimination claims also require that the plaintiff ultimately show that [her] age was the "but-for" cause of the adverse employment decision. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).

*Suarez v. Sch. Bd. of Hillsborough Cty., Fla.*, 638 F. App'x 897, 899 (11th Cir. 2016).

## A.  Awarding Bumpers the Chemistry Supervisor Position in March 2014

For purposes of the instant motion, the Defendant assumes that Smith can establish a prima facie case of race and age discrimination as to the promotion of Bumpers to the Chemistry supervisor position in March 2014. (Doc. 40 at 25). Accordingly, the burden shifts to the Defendant to articulate a legitimate non-discriminatory reason why Bumpers was promoted over the Plaintiff.

In this case, the Defendant states that "[t]he reason Smith was not selected to fill the . . . position is because she was not the most qualified candidate for the position." (Doc. 40 at 26).

The Defendant having articulated a legitimate non-discriminatory reason for the Plaintiff not receiving the promotion, the burden shifts back to the Plaintiff to demonstrate that this reason is merely a pretext for race and age discrimination. She cannot do so because **it is undisputed that the Plaintiff would not have been selected for the position over Bumpers because Bumpers had superior qualifications.** (*See*, doc. 40 at 16, ¶34 (Defendant's proffered fact); doc. 44 at 5, ¶34 (Plaintiff's admission)).

Summary Judgment will be granted in favor of the Defendant, and against the Plaintiff, on Counts One and Two, to the extent that those Counts allege

discrimination regarding the March 2014 Chemistry supervisor position given to

Bumpers.[28]

> **B.    Awarding Burrell and Maske the Chemistry and Fuels Supervisor Positions in May of 2014**
>
>> **1.    *The Fuels Supervisor Position Given to Maske***
>>
>>> **a.    The Plaintiff Fails to Establish a *Prima Facie* Case of Age Discrimination**

The Defendant does not assume a *prima facie* case of age discrimination as to

the Fuel supervisor position given to Maske. Specifically, the Defendant challenges

whether the Plaintiff can show that the Fuel supervisor position was filled by a person

"substantially younger" than the Plaintiff. (Doc. 40 at 28-29).[29] The Plaintiff

---

[28]   The Plaintiff writes:

> With respect to the first vacancy, current Alabama lab [sic] employee Mike Worthy who has observed Smith believes that she was a victim of race discrimination. Worthy was conscious of the fact that there had never been an African-American supervisor. Worthy pg. 30, lines 9-12. Worthy recognized that Smith had a done "a very good job" as team lead and was deserving of promotion. Worthy pg. 31 line 23, pg. 32 lines 1-2. (Doc. 41-3, pg. 9). Smith did not file a EEOC charge after being denied this vacancy.

(Doc. 44 at 16).  It is unclear for what purpose (*i.e.* proving her *prima facie* case or establishing pretext) this argument is offered.  However, because this argument comes directly after the Plaintiff notes that the *prima facie* case for the position Bumpers received has been assumed, the Court assumes that this argument is aimed at showing pretext.  As shown later in this opinion, Worthy's opinions on these matters will be stricken.  Regardless, because the Plaintiff has admitted that she would not have been hired over Bumpers, Worthy's opinion on the subject is irrelevant.

[29]   In this case, at the time he was hired Maske was 48 years old, and Smith was 55 years old. *See, Suarez*, 638 F. App'x at 901 ("a six-year age difference, without more, does not

acknowledges that the Defendant does not assume the *prima facie* case[30], yet fails to respond to this argument, and fails to otherwise set out a *prima facie* case of age discrimination.

Because the Plaintiff makes <u>no</u> showing on this point, she fails to carry her burden to establish a *prima facie* case. Summary Judgment is therefore due to be granted to the Defendant, and against the Plaintiff, on the ADEA claim in Count Two, to the extent that it is based on the Fuels supervisor position given to Maske.

### b.        The Plaintiff Cannot Establish Pretext[31]

Assuming the Plaintiff <u>can</u> make out a *prima facie* case of both race and age discrimination regarding the Fuel supervisor position given to Maske, her claim still fails because she cannot establish pretext. The Defendant states that "Smith was not promoted to fill the [Fuels Supervisor] position because she did not make the cut for interviews and Maske was more qualified for the position." (Doc. 40 at 29). The burden now shifts to the Plaintiff to show that this reason is a mere pretext for race

---

establish that Mr. Suarez's age was the but-for cause of the School Board's failure to hire him.").

[30]  The Plaintiff writes:  "For purposes of the defendant states that the Smith establishes a prima facie case for the first vacancy awarded Bumpers but not the others."  (Doc. 44 at 16) (exactly as written by Plaintiff's counsel).

[31]  In her deposition, other than the fact that Durant Maske is white and that there had been no other African-American supervisor in the Lab until Burrell was hired, Smith could offer no evidence that the decision to select Maske was based on race. (Doc. 41-1 at 67(264)-68(265)).

and age discrimination.

"To prove pretext, the plaintiff must show that the employer's proffered reasons were 'a coverup for a ... discriminatory decision.'" *Rodriguez v. Sec'y, U.S. Dep't of Homeland Sec.*, 518 F. App'x 653, 655 (11th Cir. 2013) (*quoting Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir.2002) (per curiam) (omissions in original) (internal quotation marks omitted).

> Pretext can be shown either by directly persuading a court that discriminatory motive more likely motivated the employer or by indirectly demonstrating the provided reason was unworthy of credence. *Sweat v. Miller Brewing* Co., 708 F.2d 655, 656 (11th Cir.1983). *See also Harris v. Shelby County Bd. Of Educ.*, 99 F.3d 1078, 1083 (11th Cir.1996) ("The focus of the case after the defendant has met the burden of production is on the defendant's subjective intent and the motivation behind the defendant's adverse employment actions directed at the plaintiff."). A plaintiff must do more than criticize the business judgment of his employer, and he cannot simply quarrel with the wisdom of the decision. *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir.2000).

*Knight v. Florida Dep't of Transp.*, 291 F. App'x 955, 958–59 (11th Cir. 2008).

> A plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered reason for the employment action so that a reasonable factfinder could find them unworthy of credence. *Springer v. Convergys Customer Mgmt. Group, Inc.*, 509 F.3d 1344, 1348 (11th Cir.2007). "However, a reason cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993) (emphasis in original). Accordingly, it is not enough to "disbelieve the employer;

the factfinder must believe the plaintiff's explanation of intentional discrimination." *Id.* at 519, 113 S.Ct. at 2754 (emphasis in original). Moreover, "[w]e are not in the business of adjudging whether employment decisions are prudent or fair. Instead, our sole concern is whether unlawful discriminatory animus motivate[d] a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir.1999).

*Kohser v. Protective Life Corp.*, No. 15-11704, 2016 WL 2587169, at *3 (11th Cir. May 5, 2016).

### (1)    Worthy's Opinions

The Plaintiff argues:

Worthy, a current employee with substantial experience supports Smith was more qualified than Maske for the job.

(Doc. 44 at 18). These "opinions" as to whether Smith was more qualified than Maske will be stricken.[32] The Plaintiff fails to offer any authority for why the opinion of Worthy should be considered. Worthy was not a decisionmaker in this case. He admits that no one ever explained to him how candidates for the positions were ranked based on qualifications and criteria. (Doc. 41-3 at 7(24)). No one ever explained to him that there was a matrix used to evaluate candidates. (Doc. 41-3 at 7(24)). He offers no opinions as to how those who were competing for the Fuel supervisor position should have been scored. Accordingly, his testimony on the

---

[32]  The Defendant has moved to strike these opinions.  (Doc. 46 at 5, and n. 3).

comparative qualifications of the Plaintiff and the other applicants is purely speculative, conclusory, and not based on personal knowledge. *See, Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 777 (10th Cir. 2008) ("a coworker's mere opinion is irrelevant"); *Grady v. BellSouth*, 160 F. App'x 863, 864–65 (11th Cir. 2005) (testimony of plaintiff's immediate supervisor that she felt plaintiff was more qualified for promotion than the person who received it, and that plaintiff was discriminated against, stricken as speculative where: supervisor admitted that she did not know who was the decision maker for the promotion; supervisor said nothing about the promotion process; there was no evidence that supervisor knew of the qualifications for promotion, was involved in the selection process for promoting candidates, or knew of the criteria for promotion).[33]

### (2)     Statistical Evidence

The Plaintiff also argues:

> [I]nconsistencies in the selection process require the denial of summary judgment. In the 29 years, Smith has been in the laboratory department there was never an African-American supervisor until Marvin Burrell was hired.

(Doc. 44 at 15). As noted by the Eleventh Circuit:

---

[33] For these same reasons, the Court will also strike Worthy's opinions as to the comparative qualifications of the Plaintiff as to <u>any</u> position at issue in this case, as well as his opinion as to whether the Plaintiff was discriminated against.

> [S]tatistical evidence is not . . . probative of pretext [where the Plaintiff] has not provided any other relevant information, including the number of [people in the protected class] who expressed interest in [the] positions. *See, e.g., Howard v. B.P. Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994). "Statistics without any analytical foundation are 'virtually meaningless.' " *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir.1997) (*quoting Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir.), cert. denied, 502 U.S. 1058, 112 S.Ct. 935 (1992)).

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004). Because the

Plaintiff provides no other relevant information (such as evidence of other qualified

African American candidates who have applied to be supervisors and were not

chosen)[34], the fact that there has only been one African American supervisor is not

---

[34] The Plaintiff acknowledges this in her brief.  (Doc. 44 at 15, n. 2). However, she contends that "zero does have some meaning," and cites, without discussion, the following language from a footnote to the Supreme Court's decision in *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977): "As the Court of Appeals remarked, the company's inability to rebut the inference of discrimination came not from a misuse of statistics but from 'the inexorable zero.'"  *Int'l Bhd. of Teamsters*, 431 U.S. at 342, n. 23 (*quoting United States v. T.I.M.E.-D.C. Inc.*, 517 F.2d 299, 315 (5th Cir. 1975)). The so-called "inexorable zero" test refers to the situation where a Court can infer discrimination, without statistical analysis, where an employer with a statistically large enough workforce employs no members of a protected group. *Darity v. MEGA Life & Health Ins. Co.*, 541 F. Supp. 2d 1360, 1373 (N.D. Ga. 2008) (*citing Woodson v. Pfizer, Inc.*, 34 F. Appx. 490, 492–93 (7th Cir.2002) (unpublished)).  "Some context [such as size of the sample and the statistical meaning of the zero], however, is still required."  *Darity*, 541 F. Supp. 2d at 1373.  In the instant case, the Plaintiff gave no such context.  Further, *Teamsters* was a pattern and practice case, brought by the government pursuant to 42 U.S.C. § 2000e-6. The Plaintiff fails to explain why this Court should apply the *Teamsters* test to a case alleging individual, as opposed to a pattern and practice of discrimination, brought by a private plaintiff.  *See, Johnson v. Gwinnett Cty. Sch. Dist.*, No. 1:11-CV-00471-TWT, 2012 WL 5987584, at *11 (N.D. Ga. Oct. 17, 2012), report and recommendation approved, No. 1:11-CV-471-TWT, 2012 WL 5987581 (N.D. Ga. Nov. 28, 2012) ("where the case is, as here, one of alleged discrimination against an individual, [the Plaintiff] must establish the size of the sample and the statistical significance of inexorable zero"); *Clark v. ALFA Ins. Co.*, No. CIV.A. 00-AR-3296-S, 2002 WL 32366291, at *3 (N.D. Ala. May 28, 2002) ("All of the cases that this court has been able to find grant this exception

evidence of pretext.[35]

### (3)    Maske's Performance Evaluations and Discipline

The Plaintiff argues:

In 2012, Maske was rated as not performing up to expectations in his current job; the solution to promote him in 2014 to the supervisor ahead of Smith (who always met expectations) supports an inference of discrimination for trial.

(Doc. 44 at 17). She continues: "Maske had a [L]evel 3 discipline and was just short of termination in 2012. Smith has never received a [L]evel 3 discipline and could not qualify for an interview for either vacancy." (Doc. 44 at 18).

As noted above, the parties have been unclear as to whether Maske's failure to meet expectations in 2012, and the Level 3 discipline, were based upon the same incident. Regardless, the Level 3 discipline had expired by the time Maske was considered for the supervisor position, and it is the Defendant's policy not to consider such disciplines after they have expired. (Doc. 41-9 at 6, ¶11; doc. 41-6 at 21-22, ¶49). The Plaintiff has offered no evidence or argument that this policy is discriminatory, or was applied unevenly or in a discriminatory manner. Further, even

---

only in pattern and practice actions, which this is not. To the extent that [the Plaintiff] is asking the court to extend the 'inexorable zero' exception to individual cases of discrimination, this court declines.").

[35] Obviously, this evidence also has no bearing on whether the Plaintiff was discriminated against based on her age.

if the discipline should have been considered, the Plaintiff fails to show how this would have affected her score on the matrix in a way that would have given her the position, or even allowed her to score high enough to merit an interview. Similarly, the Plaintiff fails to show how the fact that she had always "met expectations," and Maske had not, should have changed how she and/or Maske were scored. Finally, the Plaintiff fails to show how the two facts, <u>considered together</u>, should have changed any score she and/or Maske received.

### (4)   Maske's Failure to Make Eye Contact in the Interview

The Plaintiff argues:

> The defendant makes much of Smith's non-verbal behavior, rolling her eyes which Smith denies as a disputed fact. . . . However, Maske receives an interview and the job; in the interview he is alleged to have difficulties or needs to improve on his eye contact.

(Doc. 44 at 18). Again, the Plaintiff fails to explain how the scores on the matrix, which was scored <u>before</u> Maske's issues in the interview, should have been different.

Further, the Plaintiff's issues were not only "rolling her eyes." Heilbron and other supervisors noted that, when given constructive feedback, or if someone had a differing opinion, the Plaintiff would also cross her arms, sigh, or become defensive. (Doc. 41-6 at 7, ¶16). Sometimes she shut down and appeared not to listen to the feedback given. (Doc. 41-6 at 7, ¶16). Further, the Plaintiff had not made an effort to

42

accept the feedback and improve. (Doc. 41-6 at 7, ¶16). None of these behaviors are comparable to Maske failing to make eye contact in one interview. Even if they were, the Plaintiff has not shown that any of these behaviors were considered when she was scored.[36]

### (5)   The Scoring Changes

Finally, the Plaintiff argues:

> The Chemistry supervisor vacancy is the same job filled by Bumpers yet the matrix is scored in [a] way that Smith was excluded from the interview process. Maske's leadership score went up on the second scoring so that he advanced within the process.

(Doc. 44 at 18). The plaintiff is referring to the fact that, when the Chemistry supervisor position was posted the first time, she received a 14 and Maske received a 15. (Doc. 41-7 at 7)  However, when the position was posted the second time (combined with the Fuels supervisor position), she still scored a 14, which was below the cutoff for interviews, while Maske's score went up to a 16, the cutoff for interviews. (Doc. 41-7 at 27).

As noted above, the matrix was different the second time around in that Power Generation experience was added as a desired quality after Heilbron's experience with Bumpers demonstrated that such experience was valuable. The Plaintiff makes

---

[36]  When making the selection, Heilbron did not consider Maske's eye contact issue in the interview because "it was a one-time situation, common in interviews."  (Doc. 41-6 at 21, ¶49).

no argument and offers no evidence that this category was added in an attempt to discriminate on the basis of race or age. Indeed, the addition of this category benefitted the Plaintiff over Maske in that the Plaintiff scored a 2 and Maske scored a 1 in this area.

The scoring changed for Leadership/Performance Management because the definitions for that category changed. This time around, Heilbron did not differentiate between team leader and supervisor experience as she had done for the first posting. Smith's score remained the same for this, even though the definitions changed, because she had 4 years of supervisory experience.[37] However, Maske received a 3 in Leadership because he had been a team leader for approximately seven years. Other than to point out that the scores are different now, the Plaintiff makes no attempt to explain how changing the criteria was discriminatory. She also does not argue that the criteria, once changed, were applied in a discriminatory manner.[38]

_____

[37]  In her facts offered in opposition to the Motion for Summary Judgment, the Plaintiff implies that Maske was given a higher score because leadership experience prior to 2011 was counted for him and not for her.  (Doc. 44 at 10 ("The scoring of Maske[] changed because Heilborn [sic] was willing to give him increased credit for supervisory experience prior to 2011.")).  However, the Plaintiff was also given credit for supervisory experience obtained prior to 2011.  She was credited with 4 years of Leadership/Performance Management experience because of her time with team leader responsibilities from 2007 to 2011.  (Doc. 41-6 at 69, ¶42, n. 2).

[38]  The Court notes that there were other reasons that the Plaintiff did not score higher in the matrix. Smith received a 1 for Budgeting and a 1 on Written Communication.  Smith makes no argument that these values were improperly assessed, or that other persons with similar qualifications received better scores.

None of the Plaintiff's arguments, considered separately or together, demonstrate that the Defendant's reason for hiring Maske over her was a pretext for discrimination. For this reason, summary judgment in favor of the Defendant and against the Plaintiff is appropriate as to the race discrimination claim in Count One and the age discrimination claim in Count Two, to the extent those Counts are based upon the hiring of Maske into the Fuels supervisor position

### 2.    *The Chemistry Supervisor Position Given to Burrell*

#### a.    The Plaintiff Fails to Establish a Prima Facie Case of Race Discrimination

Burrell is African American. Accordingly, the Plaintiff cannot establish that the position was given to someone outside of her protected class. For that reason, summary judgment will be granted in favor of the Defendant, and against the Plaintiff, on the claims in Count One to the extent that they are based on race discrimination in awarding the Chemistry supervisor position to Burrell.

#### b.    Age Discrimination

Assuming that the Plaintiff has established a *prima facie* case of age discrimination[39], she cannot establish pretext.[40]

---

[39]  The Defendant makes this assumption in its initial brief.  (Doc. 40 at 31).

[40]  In her deposition, other than the fact that Marvin Burrell was younger than her, Smith could offer no evidence that the decision to select him was based on age discrimination. (Doc. 41-1 at 71(277)).

## (1)   Scoring of the Matrix

The Plaintiff argues

> There are inconsistencies in how [Burrell's] application was scored. . .
> . The screening matrix for both jobs was changed to included [sic]
> power generating experience (Burrell was coming from a power
> generating facility). Burrell then jumps to the top of the candidate pool
> score. Burrell had just over a year of lead supervisory experience. Smith
> had years of such experience.

(Doc. 44 at 19). Burrell received a 4 in Leadership/Performance Management because

he had current supervisory experience within the last two years through his role as

Lab Team Leader with SoCo's Kemper County IGCC Facility. He also received a 4

for Power Generation because he had worked at a plant since 2002. Again, Smith's

score remained a 2 for the Leadership/Performance Management category because

she had 2-4 years of supervisory experience. She received a 2 in Power Generation

because she had less than two years of plant experience from early in her career. As

with this same argument concerning Maske, the Plaintiff fails to offer any evidence

of a discriminatory motive in the addition of the new categories, or in how they were

scored.[41]

---

[41]   Heilbron noted Burrell was accurately rated a 4 because he had current supervisory
experience within the last two years as Lab Team Leader at Kemper where he had approximately
nine direct reports and was responsible for all aspects of hiring and performance management
(Heilbron Decl. ¶¶43, 47). In contrast, while Smith had some team lead responsibilities from
2007-2011, she had no direct reports and no authority to hire, terminate, or discipline other
employees (Heilbron Decl. ¶7).

### (2)      The Timing of Burrell's Application

The Plaintiff also argues:

> Burrell did not apply for the position until after the May 5, 2014 deadline. Doc. 41-, pg. 92. On May 7, 2014 after the deadline, Burrell submitted his application for the vacant positions. Doc. 41-2, pg. 99.

(Doc. 44 at 19). This argument is based on the job posting itself, which stated that the positions would be open for applications on April 24, 2014, and closed for applications on May 5, 2014. (Doc. 41-2 at 92). As Dean noted in her declaration, the position was <u>actually</u> posted until May 7, 2014. (Doc. 41-8 at 4, ¶6). She states that Burrell could not have submitted an application after the deadline because the posting, which was online and required online applications, would no longer have been available. (Doc. 41-8 at 5, ¶7). Even if the Defendant did allow Burrell to post his application after the deadline, the Plaintiff has not shown that such a decision was made with discriminatory intent.[42]

---

[42] The Plaintiff also argues:

> Worthy in confirming Smith's contention that she was discriminated against noted that Burrell had the wrong degree and the lab he supervised was in start-up mode and ordering instruments. Worthy pg. 53 lines 5-23. The lab where Smith had spent her working career was an on-going fully functional lab. Worthy pg, 54, lines 1-11.

(Doc. 444 at 19).  Again, this Court will strike Worthy's opinions.  However, to the extent that this portion of the Plaintiff's brief could be considered an <u>argument</u> that Burrell had the wrong degree for the position, and/or that Smith's leadership qualifications were better because Burrell's lab was only in "start-up mode," her argument fails.

Because none of the Plaintiff's arguments, taken separate or collectively, demonstrate that the legitimate non-discriminatory reason proffered by the Defendant for giving Burrell the Chemistry supervisor position was a mere pretext for age discrimination, summary judgment is appropriate for the Defendant as to this claim.

## IV.   CONCLUSION

For the reasons stated herein, the opinion testimony of Garry Michael Worthy regarding the comparative qualifications of the Plaintiff versus other applicants for the positions at issue in this case, as well as Worthy's opinion that the Plaintiff was discriminated against, will be **STRICKEN**. Further, for the reasons stated herein, the Defendant's Motion for Summary Judgment will be **GRANTED**, and this case will

---

First, Heilbron testified in his deposition:

[Burrell] was currently in a management position at Kemper County as a team leader. He had about nine  direct employees. He was responsible for all aspects of starting up the laboratory there. It's a construction plant with a lot of deadlines and a lot of pressures, and he was very successful in doing that. He performed all aspects of hiring, performance management, dealing with issues, and he also managed large budgets while he was at Kemper County.

(Doc. 41-2 at 39(151)).  Smith makes no effort to explain why this experience did not warrant the 4 Burrell got in leadership, or why her score in that same category, a 2, should have been higher. Smith also fails to offer evidence of, or explain how these factors should have helped her score higher, or Burrell lower, on <u>any</u> category of the matrix.

The Plaintiff also fails to explain why Burrell's degree (a major in Zoology and a minor in Chemistry) should matter.  The posting only required a "Biology, Engineering[,] or Science-related degree with 24 semester hours of chemistry."  (Doc. 41-7 at 31).  Heilbron states in her declaration that Burrell's education "indicated to [her] that he had a science related degree as well as at least 24 semester hours in Chemistry."  (Doc. 41-6 at 18, ¶43).

be **DISMISSED with prejudice**.

      **DONE** and **ORDERED** this 2nd day of August, 2016.

**VIRGINIA EMERSON HOPKINS**
United States District Judge